IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANDREW LITTLETON,** | : | **Civil No. 1:07-CV-1515** |
| **Plaintiff,** | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| **STATE FARM FIRE AND** | : | |
| **CASUALTY COMPANY,** | : | |
| **Defendants.** | : | |

# M E M O R A N D U M

This case arises in an insurance context.  Before the court is
Defendant's motion for partial summary judgment on Plaintiff's claim that
Defendant acted in bad faith toward Plaintiff in violation of 42 Pa. Con. Stat. Ann.
§ 8371.  (Doc. 19.)  Plaintiff's claim arises out of Defendant's alleged handling of
Plaintiff's insurance policy claims following a fire that annihilated Plaintiff's home.
For the reasons that follow, Defendant's motion for summary judgment will be
granted.

## I.        Background

### A.        Facts[1]

Eight chickens and a pheasant watched a fire spread through Plaintiff's
home in the early morning hours on December 21, 2005 while Plaintiff slept in his
daughter's nearby home after an exhausting day of sledding.  (Doc. 21 ¶ 2–3, Doc.
30 ex. 3 at 121.)  Plaintiff awoke from slumber to find his home essentially

---

[1]The following facts are taken primarily from Defendant's Statement of Material Undisputed
Facts (Doc. 21) and Plaintiff's Statement of Material Fact (Doc. 24) and viewed in a light most favorable
to Plaintiff.

destroyed.  (Doc. 21 ¶ 2.)  In the wake of this tragedy, Plaintiff looked to his insurance policy, a guarantee that his home and personal property would be replaced and that he would not go without a roof over his head.  (*Id.* ¶¶ 10, 11, 85, 135.)  This policy covered his dwelling, personal property, and additional living expenses.[2]

---

[2]The policy provided in pertinent part:
COVERAGE A – DWELLING
    1. Dwelling. We cover the dwelling used principally as a private residence on the residence premises shown in the Declarations.
SECTION I – LOSSES INSURED
    COVERAGE A – DWELLING
        We insure for accidental direct physical loss to the property described in Coverage A, except as provided in SECTION I – LOSSES NOT INSURED.
SECTION I – LOSS SETTLEMENT
    COVERAGE A – DWELLING
        1. A1 – Replacement Cost Loss Settlement – Similar Construction.
            a. We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I – COVERAGES, COVERAGE A – DWELLING, except for wood fences, subject to the following:
                (1) until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the Declarations, not to exceed the cost to repair or replace the damaged part of the property;
                (2) when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the Declarations, whichever is less;
                (3) to receive additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed; and
                (4) we will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, expect as provided under ….
COVERAGE B – PERSONAL PROPERTY
    We insure for accidental direct physical loss to property described in Coverage B . . .

COVERAGE B – PERSONAL PROPERTY
                    (continued...)

### 1.    The Dwelling

Plaintiff's daughter Chrystal Volz ("Chrystal") reported the fire to Defendant on December 21, 2005.  (*Id.* ¶ 11.)  On that same day, Defendant's Claim Representative Lori Smith ("CR Smith") called and spoke to Plaintiff and Chrystal to gather information about the fire.  (*Id.* ¶ 12.)  CR Smith also scheduled an inspection of the loss for the following day and retained Fire and Explosion Investigations, LLC to conduct a cause and origin investigation of the fire.  (*Id.* ¶ 12–13.)

On December 22, 2005, CR Smith inspected the loss, took measurements and photographs, and made a drawing depicting the various measurements, dimensions, and features of Plaintiff's home.  (*Id.* ¶ 15.)  After this inspection, CR Smith drove to Chrystal's home and met with Plaintiff and Chrystal.  (*Id.* ¶ 16.)  During the meeting, CR Smith, Plaintiff, and Volz reviewed policy coverages, limits, terms and conditions, and discussed various aspects of the claim.

---

[2](...continued)
                1. B1. – Limited Replacement Cost Loss Settlement.
                    a. We will pay the cost to repair or replace the property covered under
                    SECTION I – COVERAGES,
COVERAGE B – PERSONAL PROPERTY, except for property listed in item b. below, subject to the following:
          (1) until repair or replacement is completed, we will pay only the cost to repair or replace less depreciation;
          (2) after repair or replacement is completed, we will pay the difference between the cost to repair or replace less depreciation and the cost you have actually and necessarily spent to repair or replace the property; and
          (3) if property is not repaired or replaced within two years after the date of loss, we will pay only the cost to repair or replace less depreciation.
COVERAGE C – LOSS OF USE
1. Additional Living Expenses. When a Loss Insured caused the residence premises to become uninhabitable, we will cover the necessary increase in cost you incur to maintain your standard of living for up to 24 months. Our payment is limited to incurred costs for the shortest of: (a) the time required to repair or replace the premises; (b) the time required for your household to settle elsewhere; or (c) 24 months. This coverage is not reduced by the expiration of this policy.

(*Id.*)  CR Smith also advised Plaintiff to notify his mortgage company, deposit the advance payments, and check on general contractors and builders.  (*Id.* ¶ 17.)

Following the meeting, CR Smith immediately began working on a building estimate.  On December 27, 2005, CR Smith called Plaintiff to inform him that an estimate would be completed in approximately one week.  (*Id.* ¶ 18.)  On January 4, 2006, CR Smith called Plaintiff and left a message stating that she would like to review Defendant's building estimate with him.  (*Id.* ¶ 19.)  On January 6, 2006, CR Smith called Plaintiff and scheduled a meeting for January 11, 2006 to review the coverages under the policy and the estimate she prepared.  (*Id.* ¶ 22.)  CR Smith met with Plaintiff at Chrystal's home on January 11 to discuss the dwelling damage estimates.  (Doc. 24 ¶ 23, Doc 21 ¶ 23.)  CR Smith based her initial estimate on measurements and observations of the loss site.  (*Id.* ¶ 20.)

Plaintiff had purchased his house along with over 100 acres of land in 1997 for $168,000.  (*Id.*  ¶ 21.)  The house—a bi-level with three bedrooms, a kitchen, dining room, living room, and a bathroom on the main floor and a family room, utility room, and garage downstairs—was built in 1978.  (*Id.*)  CR Smith determined that the Replacement Cost Value ("RCV") of the dwelling was $135, 231.68 and the Actual Cash Value was ("ACV") $133,245.47.  (*Id.* ¶ 20.)  Plaintiff, however, advised CR Smith that he wanted the limits of his policy, $228,588.  (Doc. 28 ex. 3 at 169–70.)  CR Smith denied that the policy required payment of the limits and explained the provisions relating to ACV.

During the January 11 meeting, Plaintiff suggested several changes to CR Smith's estimates, and CR Smith took notes on these changes.  (Doc. 24 ¶ 24).  Two days after the meeting CR Smith made changes to the estimate based on Plaintiff's suggestions and created a revised damage estimate of $138,473.91 RCV and $110,130.45 ACV.  (*Id.* ¶ 27–28.)  On January 13, 2006, CR Smith called

Plaintiff to advise him that Defendant would not pay the policy limit and sent a revised damage estimate along with a check for $92,170.45.[3]  (*Id.* ¶ 29.)  The letter explained that Defendant would pay Plaintiff an additional $27,843.46 representing depreciation if Plaintiff incurred that amount in rebuilding.  (*Id.* ¶ 31.)

On April 21, 2006, Plaintiff sent a letter demanding appraisal, and subsequently named his public adjuster Glen Pannebakker as his appraiser.  (*Id.* ¶¶ 37, 39.)  Plaintiff's policy set forth the following terms relating to appraisal:

> If you and we fail to agree on the amount of the loss, either one can demand that the amount of loss be set by appraisal. If either makes a written demand for appraisal, each shall select a competent, disinterested appraiser.  Each shall notify the other of the appraiser's identity within 20 days of receipt of the written demand.

(*Id.* ¶ 38.)  Defendant objected to Pannebakker serving as Plaintiff's appraiser.  (*Id.* ¶ 40.)  Defendant advised Plaintiff that Pannebakker was not a disinterested, independent appraiser because Pannebakker was already under contract with Plaintiff concerning his personal property claims.  (Doc. 31 ex. 16 at 45–49.)  CR Smith described this perceived ethical conflict to Pannebakker, and Pannebakker subsequently testified that "it was a gray area issue, and I didn't think it was appropriate to pursue it any further."  (*Id.*)  Accordingly, Pannebakker explained to Plaintiff that he would not accept appointment as appraiser and recommended that Plaintiff enlist Troy Garrett, an established public adjuster.  (*Id.*)  CR Smith sent at least six letters over the following months inquiring about the status of the appraisal process.  (Doc. 21 ¶ 48.)  Plaintiff, however, did not appoint another appraiser and the appraisal never occurred.  (*Id.* ¶ 49.)  Rather, Plaintiff continued to send Defendant requests for the policy limit as well as a letter on May 11, 2006, listing

---

[3]The $92,170.45 payment represented the ACV amount, $110,630.45 minus the $500 deductible and a payment of $18,460 to East Hopewell Township pursuant to 40 Pa. Con. Stat. Ann. § 638.

two construction estimates for $237,000 and $177,770, but failing to include copies of the estimates.  (*Id.* ¶ 46.)

Over the next year, Plaintiff obtained several dwelling damage estimates ranging from $162,953 to $290,187.50.  (*Id.* ¶¶ 52–53.)  On May 7, 2007, Defendant engaged Tuckey Restoration, Inc. to review Defendant's original and revised estimates as well as Plaintiff's estimates.  (*Id.* ¶ 56.)  Tuckey provided a summary comparison of the estimates and determined that Plaintiff's estimates included upgrades and additional work.  (*Id.* ¶¶ 57–58.)  On May 15, 2007, pursuant to Defendant's request, Defendant's representatives met with Plaintiff, his counsel, his daughter, and a friend to discuss the dwelling estimates and Tuckey's report. (*Id.* ¶ 59.)  On May 23, 2007, Defendant prepared a revised estimate for a RVC of $167,971.27 and ACV of $142,836.82.  (*Id.* ¶ 63.)  On June 6, 2007, Defendant again revised its estimate to $175,121.32 RCV and $150,007.22 ACV.  (*Id.* ¶ 68.) On June 13, 2007, Defendant sent Plaintiff's attorney the revised estimate, along with a check for $10,802.75 payable to Plaintiff, and paid the township $4,889.51. (*Id.* ¶ 69.)  To date, Plaintiff has neither hired a contractor or builder to commence rebuilding his home nor signed any plans for rebuilding his home.

## 2.    The Personal Property

On December 22, 2005, the day after the fire, CR Smith met with Plaintiff and Chrystal and provided Personal Property Inventory forms.  (*Id.* ¶ 82.) CR Smith gave Plaintiff a $2,000 advance, in addition to the $1,000 given to Plaintiff on December 21, so Plaintiff could purchase a bed and other necessary items.  (*Id.* ¶ 84.)  In accordance with the policy language, Plaintiff had sixty days after the loss to submit inventory forms.  (*Id.* ¶ 86.)  On January 4, 2006, CR Smith called Plaintiff and left a message inquiring about the contents claims, and asked whether Plaintiff had any questions regarding the claim.  (*Id.* ¶ 88.)  During the

January 11 meeting, CR Smith discussed the contents claim and reviewed the personal property coverage, and Plaintiff explained that he was preparing the inventory list.  (*Id.* ¶ 89.)  CR Smith inquired about the status of the inventory list on January 23, 2006 and February 10, 2006.  (*Id.* ¶ 90.)

On February 23, 2006, Plaintiff hired an experienced public adjuster, Pannebakker, to handle his personal property claim in exchange for ten percent of the total personal property claim.  (*Id.* ¶ 91–92.)  Pannebakker acknowledged that Defendant supplied inventory forms standard for the industry.  Pannebakker sent a letter to claim representative Ray Moncavage ("CR Moncavage") on February 23, 2006, which stated that he had begun preparing the inventory with Plaintiff and would send it as soon as possible.  (*Id.* ¶ 93–94.)  CR Moncavage sent a letter on March 2, 2006 requesting Pannebakker forward the completed inventory forms and reminded him that the policy required Plaintiff to submit the form within sixty days after the loss.  (*Id.* ¶ 95.)  Two weeks later on March 24, 2006, CR Moncavage called Pannebakker and left a message regarding the inventory list.  (*Id.* ¶ 96.)  The following day Pannebakker explained to CR Moncavage that he had scheduled a meeting with Plaintiff and they hoped to have the inventory by the following week. (*Id* ¶ 97.)  Over the next few weeks CR Smith contacted Pannebakker several times regarding the inventory lists, and Pannebakker explained that he would forward a partial inventory list as soon as possible.  (*Id.* ¶ 98–99.)  CR Smith contacted Pannebakker multiple times in June, and Pannebakker eventually submitted a partial inventory list on July 18, 2006—roughly seven months after the loss and well beyond the sixty day policy limit.  (*Id.* ¶ 100–03.)

While Defendant awaited a complete inventory list, Pannebakker requested a $50,000 advance, which Defendant denied.  (*Id.* ¶ 104–08.)  Defendant began processing Plaintiff's partial inventory, but continued to seek a complete

inventory as well as data, such as ages and descriptions of items, necessary to process the forms. (*Id.* ¶ 109.) Pannebakker and CR Smith discussed these issues over the next couple months, and Defendant issued a check for $31,731.77, which represented the ACV for the items for which information had been provided. (*Id.* ¶ 110–13.) On December 8, 2006, Pannebakker submitted Plaintiff's personal bank statements from January 1999 to December 2005 along with a Sworn Statement in Proof of Loss, claiming $146,583.19 in partial contents loss. (*Id.* ¶ 117–18.)

About a week later, Plaintiff filed a Writ of Summons against Defendant in the Court of Common Pleas of York County, Pennsylvania. (*Id.* ¶ 121.) Plaintiff, a few months later, submitted a complete inventory list through his counsel, claiming $291,130.36 in losses. (*Id.* ¶ 124.) Plaintiff's friend Diane Hibler prepared the complete list on her computer in approximately twenty-four hours based on a recitation from Plaintiff's memory of all the items in his house. (*Id.* ¶ 125–30.) Shortly thereafter, Defendant issued a check in the amount of $136,709.23, representing the balance of Plaintiff's personal property limits. (*Id.* ¶ 131.)

### 3.    The Additional Living Expenses

Plaintiff's policy covered additional living expenses incurred due to his inability to continue living in his house. (*Id.* ¶ 135–36.) The policy limited coverage to the incurred costs for the shortest of (a) the time required to repair or replace the premises, (b) the time required for Plaintiff to settle elsewhere, or (c) twenty-four months.

On December 21, 2005, Plaintiff informed CR Smith that he preferred to live in his daughter Chrystal's house—less than two miles from his house. (*Id.* ¶ 140.) That same day, CR Smith contacted Marriot Execustay, a housing service vendor, to locate potential housing for Plaintiff to stay in while he rebuilt his house.

(*Id.* ¶ 139.)  CR Smith offered to pay Chrystal and her husband $400 per month as payment for Plaintiff living in their house. (*Id.* ¶ 142.)  Chrystal lived with her husband and her daughter in a 1400 square foot home. (*Id.* ¶ 146.)  Plaintiff stayed in Chrystal's finished basement, which included a bed, entertainment center, computer, a recliner chair, wood burning stove, a window, and access to outside through the garage. (*Id.* ¶ 147.)  Plaintiff shared the main upstairs bathroom. (*Id.*)  Plaintiff has stayed with his daughter from the day of the fire until the present. (*Id.* ¶ 148.)

Although Defendant had difficulty meeting Plaintiff's request for housing in Felton, a rural area, Defendant found Plaintiff a fully furnished two bedroom one and a half bath apartment in Red Lion, Pennsylvania only eight miles from Plaintiff's house. (*Id.* ¶ 157.)  The Red Lion apartment included a complete bedroom set, bedroom or office set in the second bedroom, dining room set, living room set, television with a DVD player, full complement of kitchen accessories, bathroom linen package, and bedroom linen package. (*Id.* ¶ 158.)  Plaintiff rejected this offer, because the apartment did not have sufficient space to care for his eight chickens and one pheasant.  The chickens and pheasant died, however, shortly after Defendant made the offer as the result of being mauled by an unidentified animal in the middle of the night while Plaintiff slept in his daughter's house a mile and a half away. (*See* Doc. 24 ¶ 159, Doc. 28 ex. 3.)  The apartment, although undeniably insufficient accommodation for eight dead chickens and a dead pheasant, would have cost $2,300 a month, and Defendant offered to pay for this accommodation while Plaintiff rebuilt his home. (*Id.* ¶ 161–65.)

Plaintiff, however, wished to continue residing with his daughter and, after calling three nearby hotels, determined that his policy required Defendant to pay his daughter and her husband $105 *per day* to live in their basement. (*Id.* ¶

153–54, 160, 163.)  Defendant informed Plaintiff that this was an unreasonable rate, and that Plaintiff had failed to consider that the $105 per day rate is higher than a long-term housing rate and that the $105 rate included profit margins, professional services, and additional business expenses not incurred by his daughter.  (*Id.* ¶ 164–65.)  On March 2, 2006, CR Moncavage issue a check for $13,800 to Plaintiff, representing $2,300 a month for the six month projected rebuilding period.  (*Id.* ¶ 175.)  On June 13, 2007, Defendant issued an additional $4,600 representing two additional months for planning, permitting, and contractor selection.  (*Id.* ¶ 188.)  Plaintiff, nonethless, has insisted that Defendant must pay him $91,200, or $3,800 per month for twenty-four months, a rather loose calculation of Plaintiff's $105 per night request.  (*Id.* ¶ 198.)

## B.   Procedural History

On July 19, 2007, Plaintiff filed a complaint against Defendant in the York County Court of Common Pleas, alleging breach of contract, bad faith, unfair trade practices, negligent misrepresentation, and negligent and intentional infliction of emotional distress.  (Doc. 22 ex. 1.)  Defendant removed the case pursuant to 28 U.S.C. § 1446.  (Doc. 1.)  Defendant filed a motion to dismiss Plaintiff's complaint on August 23, 2007, and the court granted the motion with respect to Plaintiff's claim for emotional distress and averment in ¶ 47(d) of Count III.  (Doc. 13.)  By stipulation of the parties dated June 18, 2008 and court order on June 20, 2008, Plaintiff voluntarily withdrew his unfair trade practices and negligent misrepresentation claims.  (Docs. 17, 18.)

Defendant submitted a motion for partial summary judgment on June 23, 2008 along with a brief in support of that motion, a statement of undisputed facts, and several exhibits (Docs. 19–22.)  Plaintiff filed his brief in opposition and supporting documents on July 11, 2008 (Docs. 23, 24.)  Defendant filed a reply brief

on July 18, 2008.  (Doc. 38.)  Accordingly, Defendant's motion for partial summary judgment is ripe for disposition.

## II.        __Legal Standard__

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231–32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.* at 248.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial."  *Celotex*, 477 U.S. at 322–23.

"'Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'"  *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

**III.**        **Discussion**

Defendant seeks partial summary judgment on Plaintiff's bad faith claim, arguing that Plaintiff, as a matter of law, has failed to prove by clear and convincing evidence that Defendant acted in bad faith in the handling of Plaintiff's insurance claims.  Plaintiff nonetheless argues that sufficient facts exist to raise a genuine issue of material fact regarding whether Defendant acted by clear and convincing evidence in bad faith in handling Plaintiff's insurance claims. Specifically, Plaintiff points to the following alleged conduct by Defendant: "(1) refusal to submit to the contractual appraisal process on the replacement cost of Mr. Littleton's dwelling; (2) failure to communicate by meeting or telephone; (3) refusal to answer inquiries on February 20, 2006; (4) refusal to provide any ALE for over two months and thereafter denial of any additional ALE; (5) effort to exact leverage over Mr Littleton to reduce his ALE; (6) denial of payments on personal property loss until October 2006 and then paying only a fraction of the loss; and, (7) failure to even refer to its operational guides in adjusting Mr. Littleton's loss."

The court has carefully reviewed all evidence presented by the parties. The court finds that most of the alleged conduct attributed to Defendant by Plaintiff either did not occur or blatantly contradicts the record before the court.  The remaining conduct does not suggest bad faith by Defendant.  Accordingly, the court is not prepared to conclude a genuine issue of material fact exists where no rational trier of fact could conclude by clear and convincing evidence that Defendant acted in bad faith in handling Plaintiff's claim.  Therefore, Defendant's motion for partial summary judgment will be granted for the reasons that follow.

### A.    **Plaintiff's Bad Faith Claim**

Defendant argues that Plaintiff has failed to establish a claim for bad faith.  Pennsylvania has created a statutory right against an insurer who acts in bad

faith toward an insured.  42 Pa. Con. Stat. Ann. § 8371.  The Pennsylvania Supreme Court has defined bad faith by an insurer as "any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such a refusal be fraudulent." *Terletsky v. Prudential Prop. and Cas. Ins. Co.*, 649 A.2d 680, 688 (1994).  To prove bad faith, a Plaintiff must satisfy two elements by clear and convincing evidence: (1) that the insurer lacked a reasonable basis for denying benefits and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis. *Terletsky*, 649 A.2d at 688; *Klinger v. State Farm Mut. Auto Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997.)  "[M]ere negligence on the part of the insurer is insufficient to constitute bad faith."  *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 752 (3d Cir. 1994).

   Plaintiff has failed to establish that Defendant lacked a reasonable basis for denying benefits under Plaintiff's dwelling, personal property, or additional living expenses policies.  This much is clear even from the plain language of the policies, and is further supported by Defendant's investigation of Plaintiff's claim, tender of payment, and extension of deadlines for payment under the policies even where Plaintiff failed to satisfy those deadlines.

   Plaintiff's dwelling policy clearly states that Defendant "will pay only the actual cash value at the time of loss of the damaged part of the property up to the applicable limit of liability . . . ***not to exceed the cost to repair the damaged part of the property***" along with any "additional amount you actually and necessarily spend to repair or replace the damaged part of the property."  (emphasis added).  As the plain language indicates, Defendant had no obligation to pay the policy limits on Plaintiff's dwelling coverage.  Moreover, Defendant's representative CR Smith surveyed the damaged property and promptly created an estimate of dwelling damages about two weeks after the fire, which she revised after meeting with

14

Plaintiff.  Defendant estimated a RCV of $138,473.91 and an ACV of $110,130.45, and CR Smith sent Plaintiff a check for his dwelling coverage based on this estimate about three weeks after the fire.  While Plaintiff considered this estimate too low, Plaintiff's unwillingness to appoint an independent appraiser primarily caused the delayed adjustment in this amount to $175,121.32.  Regardless, Defendant's good faith belief that Pannebakker was not a disinterested appraiser because of his role in Plaintiff's personal property claim and Defendant's investigation resulting in a low estimate do not support a claim of bad faith.  *Condio v. Erie Ins. Exchange*, 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006) ("[O]ur courts have not recognized bad faith where the insurer makes a low but reasonable estimate of the insured's loss, or where the insurer made a reasonable legal conclusion based on an area of the law that is uncertain or in flux."); *accord Blaylock v. Allstate Ins. Co.*, No. 1:CV-06-1456, 2008 WL 80056, at *7 (M.D. Pa. Jan. 7, 2008).

Likewise, Defendant took immediate steps to resolve Plaintiff's personal property claims.  Defendant forwarded Plaintiff $3,000 for temporary expenses while Plaintiff stayed with his daughter.  Defendant supplied Plaintiff the necessary personal property inventory forms, and kept in constant contact with Plaintiff regarding the sixty day deadline for submitting his inventories.  When Plaintiff eventually submitted a "preliminary" personal property inventory several months after the deadline had passed, Defendant processed the items for which adequate information had been provided and issued Plaintiff a partial payment of $31,731.77.  Plaintiff did not submit a completed inventory until more than fifteen months after the loss, and he has admitted that he created the completed inventory in about twenty-four hours from memory with the help of a friend who had never created an insurance property inventory.  Defendant tendered the remainder of Plaintiff's personal property policy limits—totaling $171,441—shortly after

receiving the completed inventory.  The court cannot attribute bad faith to Defendant based on Plaintiff's failure to act in accordance with the terms of the policy.

Finally, Plaintiff has not established that Defendant acted in bad faith toward Plaintiff with regard to Plaintiff's additional living expenses, because Plaintiff has failed to establish that Defendant's tender of $2,300 a month to cover living expenses lacked a reasonable basis.  Plaintiff's suggestion that Defendant acted in bad faith because it refused to pay Plaintiff's daughter $105 per night to live in her basement is nonsense on stilts that turns Plaintiff's tragedy into a farce as effortlessly and eloquently as the last two lines of Shakespeare's 100th sonnet.  It is not a corollary of the proscription against Defendant acting in bad faith that Defendant satisfy Plaintiff's every demand no matter how outlandish.  *See Williams v. Hartford Cas. Ins. Co.*, 83 F. Supp. 2d 567, 571 (E.D. Pa. 2000) ("[A]n insurer is not required actively to submerge its own interest.").  Plaintiff, therefore, has failed to establish a bad faith claim against Defendant.

IV.     **Conclusion**

For the foregoing reasons, Defendant's motion for partial summary judgment is granted.  An appropriate order will follow.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  September 22, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANDREW LITTLETON,** | : | **Civil No. 1:07-CV-1515** |
| **Plaintiff,** | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| **STATE FARM FIRE AND CASUALTY COMPANY,** | : | |
| **Defendants.** | : | |

## O R D E R

In accordance with the foregoing discussion, **IT IS HEREBY ORDERED THAT**:

1) Defendant's motion for partial summary judgment is **GRANTED** in favor of Defendant on Plaintiff's bad faith claim under 42 Pa. Con. Stat. Ann. § 8371.

2) The Clerk of Court shall defer entry of judgment until the conclusion of the case.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  September 22, 2008.

1